# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
July 27, 2010 Session

## RHONDA L. (HALL) GREER v. JOHN BRADLEY GREER

**Rule 3 Appeal from the Chancery Court for Madison County**
**No. 65321   James F.  Butler, Chancellor**

---

**No. W2009-01587-COA-R3-CV - Filed September 30, 2010**

---

This is a divorce appeal involving parenting issues.  The parties are the parents of three minor children.  Prior to trial, the parties went through mediation and arrived at an agreement on many of their issues.  The trial court then conducted a trial, taking testimony from the parties on a range of issues, including some that were the subject of the mediated agreement. The divorce decree and the parenting plan entered by the trial court adopted some of the parenting provisions in the mediated agreement, but not others.  The father filed a motion to alter or amend this final decree, and a subsequent motion to enforce the parenting plan. The trial court modified the parenting plan in part and issued a final order. The father now appeals.  We affirm, holding that the trial court did not abuse its discretion with respect to the number of parenting days allocated to the parties or the decision-making authority on the children's medical decisions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed.**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

John Bradley Greer, Jackson, Tennessee, for the Defendant/Appellant, John Bradley Greer[1]

Rhonda L. (Hall) Greer, Jackson, Tennessee, for the Plaintiff/Appellee, Rhonda L. (Hall) Greer.[2]

## OPINION

### FACTS AND PROCEEDINGS BELOW

Defendant/Appellant John Bradley Greer ("Father") and Plaintiff/Appellee Rhonda L. (Hall) Greer ("Mother") were married on September 10, 1994. The parties had three children during their marriage, born in 1996, 1997, and 1999.

Both parties have college degrees; Mother has a music degree, and Father has a degree in business administration. Prior to their marriage, Father began a business selling promotional products, a sole proprietorship called Premier Promotions.[3] Mother was employed by a blood services company. Mother left her employment in 1997, when the parties' children were quite young. Father's business came to have several employees, for administrative work and for sales. After a while, Mother began doing part-time work for Father's business, to increase the revenues from the business and to allow Mother flexibility for parenting responsibilities. Neither parent got a paycheck from Premier Promotions; instead, Father would simply ask the employee who handled the funds for the business to write him a check to meet the family's needs.

After a while, Father's business, and therefore the parties' family, began experiencing financial difficulties. At the same time, the records for the business were apparently not well-kept. Concomitantly, no income tax returns were filed by the parties, specifically for the years 2000-2004. The parties argued over financial matters, in particular about Father's failure to gather and organize the business records necessary to file income tax returns.

In 2004, Mother took a salaried position with a pharmaceutical company. In 2005, the parties resumed filing income tax returns every year. Despite the financial challenges regarding Father's business, in 2005, the parties apparently purchased a building for the business,

---

[1]Mr. Greer represented himself in this proceeding. Both parties were represented by counsel in the trial court below.

[2]Ms. Greer did not file a brief or appear for oral arguments.

[3]Father described the business's various promotional products as "things with logos on them."

borrowing money to do so. After a while, however, Father ceased operating his business under the name Premier Promotions, and its employees were let go. Father began operating as an independent contractor, in the same line of business, through his father's company, in the basement of the marital home.

In March 2008, the parties separated and Mother filed a complaint for divorce. After some contentious litigation, Father filed an answer and counterclaimed for divorce. Both parties asked to be designated as the children's primary residential parent, and both sought alimony and child support from the other. They disputed who should be responsible for the considerable debt, which included unpaid taxes estimated to be some $100,000.[4]

On October 30, 2008, the parties entered into mandatory meditation. They were successful in reaching an agreement as to many of the issues in the case, including parenting time and responsibility for decision making. Under the signed mediation agreement, Mother was designated as the primary residential parent and allocated 200 residential parenting days per year, and Father was allocated 165 residential parenting days. Decision making was to be joint, and neither party would pay either alimony or child support. Some issues, such as the residential parenting schedule and responsibility for many of the parties' debts, remained outstanding.

The trial was held on February 17, 2009. The mediated agreement was introduced into evidence. Several witnesses testified, including both of the parties. The parties testified about their financial issues that were not resolved in mediation, and testified at length about parenting issues as well. At the time of trial, the parties' children were twelve, eleven, and nine years old; the eleven-year-old has asthma and uses prescription medication and a machine to help her breathe.

Mother testified that Father had the responsibility for gathering the records for his business and preparing the parties' tax returns, and his continuing failure to do so had been a bone of contention for several years. She said that she had offered repeatedly to assist him, but the tax returns were nonetheless never filed. The parties resumed filing income tax returns in 2005, after Mother went back to work full-time. Mother made approximately $65,000 per year in her new job, and claimed no dependents for tax purposes, so that the maximum taxes would be withheld from her paycheck, in order to offset the tax liabilities associated with Father's failure to file returns for the years 2000-2004. Mother maintained that the debt for unpaid taxes and penalties, as well as the debt for a $38,000 bank loan for Father's business,

---

[4]The marital home had a tax lien of approximately $26,000, as well as a judgment lien for the loan that was used, at least in part, to purchase the building for Premier Promotions.

the loan to purchase a building for Father's business, and a credit card used for Father's business, should be allocated to Father.

Mother testified about the residential parenting schedule that she believed was in the children's best interest. Father wished to have the parenting time allocated on a "week on, week off" basis. Mother testified that she preferred more of an extended weekend approach, in which the children would not have to go an entire week without seeing either parent. Mother said that the children had indicated that they did not want to be away from her more than a few days. When Father's attorney objected to parenting questions on matters that were covered under the parties' mediated agreement, the trial court responded:

> I'm going to let her go into that, and I'll let him go into it. I don't know that it was settlement negotiations because apparently it wasn't settled. We had the hearing after the mediation, and I'm going to have to make a decision about the time specifics of the children. So, I would like to know . . . what she feels and . . . what he feels about it. . . . I've got to decide if that's in their best interest.

Consequently, Mother testified that the number of residential parenting days allocated to Father in the mediated agreement was more than she "was comfortable with."

After the parties separated, Father retained the marital home and Mother moved to a new home in another neighborhood. Mother testified that her new neighborhood was safer for the children than the old neighborhood. In their old neighborhood, she said, children could not ride their bicycles outside without parental supervision. She described her new neighborhood as "brand new," with a park nearby, where the children had made many friends and could ride their bicycles "without feeling uncomfortable." Overall, Mother said, her proposed parenting plan offered more stability for the children and was in their best interest. With regard to the parties' decision making, Mother testified that she was agreeable to joint decision making, as set forth in the mediated agreement, and indicated that she thought it was in the children's best interest.

In his testimony, Father agreed that the parties had had serious financial issues during the last several years of their marriage. He readily agreed that Mother made more money than did he; Father said that his income in 2008 was approximately $35,000. He had difficulty estimating his income at the time of trial, but listed it on his statement of income and expenses at approximately $2600 per month, against claimed expenses of $4700 per month. Asked why he failed to file income tax returns for four years, Father responded: "I got really

behind. I got extremely busy . . .[a]nd then it snowballed."[5] As of the date of the trial, the parties' tax returns for 2000-2004 had not yet been filed; Father said that his business records for those years were "rough" and he could only "guesstimate" the income.

On the parenting issues, Father disagreed with Mother's assessment of the safety of the neighborhood in which the marital home is located, and said that it is "great." For the past three years, he said, Mother has "done more providing and I've done more parenting." Father claimed that the children were not completing their homework during Mother's residential parenting time, because of the demands of her work. In contrast, Father said, during his time with the children, he would "pick them up from school and come home with them and take care of . . . homework." Father said that he "believe[s] in structure for children" and felt that his proposed parenting schedule, alternating weeks, provided more structure and stability and was in the children's best interest.

With regard to their daughter's asthma, Father expressed frustration that Mother had told him that he should obtain a supply of the asthma medication for his home as well as another of the machines used to help her breathe. Father felt that Mother should be willing to share the prescription medications and the breathing machine she had obtained for their daughter. He conceded that Mother "is better medically" and "understands more of this stuff." He asserted that, "I just think the medications need to stay with the child and not with the parent."

On February 19, 2009, the trial court issued a letter ruling, setting out its findings of fact and its rulings. On the parties' financial issues, the trial court found that Father was primarily responsible for the failure to file income tax returns. It described his negligence in causing the tax debt as "excessive" and found his excuses for failing to file "not credible." Because the tax returns had not yet been filed, the trial court could not assign fixed amounts, but instead allocated seventy percent of the unknown total income tax liability to Husband. The trial court also allocated most of the business-related debts to Husband, including one hundred percent of the business's payroll tax liability.

On the parenting issues, at the outset, the trial court found that "both parties are good, well qualified parents." The trial court acknowledged that the parties had signed a mediated agreement that was submitted into evidence. It specifically disapproved of the provision in the mediated agreement that neither party would pay child support; Father was assigned a

---

[5]Father testified that he sought Mother's help with the taxes and said "we" had the responsibility for taking care of the taxes in the household. He conceded, however, that Mother's work with his business had nothing to do with the payroll records necessary for filing payroll taxes, and that he had given all the responsibility for the business's financial records to an employee who left. Nevertheless, Father took the position that the parties should be equally responsible for all of the tax debt.

child support obligation of $239 per month. Subject to that exception, the trial court said, it "approve[d] the Mediation Agreement entered into by the parties." Regarding the allocation of parenting time, the trial court observed that the parenting plan submitted by both parties would "require the children to effectively move their residence several times a month to the extent that the children will not know where 'home' is." The trial court found that Mother's proposed permanent parenting plan was in the children's best interest and approved it with a few exceptions. The trial court commented that Father needed to "take a portion of the time he wishes to spend with the children and concentrate on his income production and the filing of delinquent tax returns."

On April 7, 2009, the trial court issued a final decree of divorce, including a permanent parenting plan allocating Father 165 days of residential parenting time, consistent with the number of days set forth in the mediated agreement. The permanent parenting plan stated that all major decisions would be made jointly. It set forth a specific schedule for the parties' residential parenting time.

On May 7, 2009, Father filed a motion to alter or amend the final decree. In the motion, Father asked for relief from the provisions in the final decree requiring him to pay seventy percent of the income tax liability and one hundred percent of the business's payroll tax liability. He asked for relief from the provision requiring him to pay Mother child support. As to the parties' residential parenting time, Father noted that the specific schedule contained in the permanent parenting plan adopted by the trial court did not result in Father having 165 residential parenting days per year, the total number of days set forth in the final decree, and he asked that it be altered.

The motion to alter or amend was heard on July 6, 2009. In the hearing, Father contended, *inter alia*, that there was a discrepancy between the number of parenting days to which the parties had agreed and the actual allocation of parenting days ordered by the trial court in the final decree. Father argued that the final decree should be amended to give him 165 residential parenting days, consistent with the parenting time allocation in the parties' mediated agreement. The trial court declined Father's request. It explained:

> Now, when counsel submitted to the Court the proposed parenting plan at the trial, the mother's plan and the father's plan, they both had 200 and 165 on them, so I assumed that y'all had counted the days, a bad assumption on my part, so I didn't count them. Now -- and I used those figures in the plan. When I look at the mother's plan that I adopted, I only count 148 days. I did not want to do a week to week and I simply rejected that because I didn't think it was the proper thing to switch the children back and forth every week. It's too much trouble and they're in

school and very seldom is a good plan, so I adopted the mother's plan. . . . I'm not going to you know, try to mess it around, so when I put it in the letter that [child support] was $239.00 father to mother, I may have -- I did make a mistake there, but I did not count the days, so if you all want to count the days yourself and see if that will make any difference, but I get 148 days, and I'm not inclined to change that because I think that's more than adequate.

The trial court issued a letter to the parties granting Father relief from the child support obligation; the letter attached a child support worksheet which granted Mother 217 parenting days annually and awarded Father 148 annual parenting days. Father filed a notice of appeal on July 29, 2009.[6]

On September 15, 2009, Mother filed a motion to add the parties' parenting plan as an exhibit to the trial record. On November 24, 2009, Father filed a *pro se* "Motion to Enforce Parenting Plan," asking the trial court to, among other things, compel Mother to "follow the Parenting Plan as it relates to . . .[j]oint decision making for non-emergency health care." On December 4, 2009, the trial court entered an order granting Mother's motion to add her proposed parenting plan as an exhibit to the trial record.

On January 27, 2010, the trial court issued an order denying in part and granting in part Father's Motion to Enforce Parenting Plan. In the order, the trial court indicates that an evidentiary hearing was held, at which Mother was represented by counsel and at which Father represented himself. It states that both parties testified; however, the appellate record does not contain a transcript of the hearing. Based on the parties' testimony and the record as a whole, the trial court modified the permanent parenting plan "to provide that the Mother shall make all medical decisions for the minor children and shall notify the Father of said decisions within twenty-four (24) hours." On February 1, 2010, the trial court entered a final order incorporating the Final Decree of Absolute Divorce, the Parenting Plan Order, and all prior orders entered in the cause. Father now appeals *pro* se. Mother did not file a brief or appear at oral argument.

---

[6]As the trial court's order was not final at that point, Father's July 29, 2009 notice of appeal is considered premature. The final order was entered on February 1, 2010. Under Tenn. R. App. P. 4(d), a prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof. Therefore, this Court has jurisdiction to hear all issues set forth by Father concerning amendments to the parenting plan, including those arising out of the final order issued on February 1, 2010.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father argues that the trial court erred in modifying the mediated agreement entered into by both parties. Specifically, Father argues that the trial court erred in awarding him 148 residential parenting days per year rather than the 165 residential parenting days provided for in the mediated agreement. Father also alleges that the trial court erred in giving Mother the authority to make all non-emergency medical decisions for the children, rather than ordering joint decision making as set forth in the mediated agreement.

In divorce cases, parenting decisions regarding the parties' children are peculiarly within the broad discretion of the trial judge. *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988). The trial court's decisions on these issues are reviewed on appeal under an abuse of discretion standard. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *Id.* (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)). When no error in the trial court's ruling is evident from the record, the trial court's ruling will stand. *Id*. at 88. The trial court's decision need not be ideal, even in parenting matters, and the appellate court should not reverse the trial court's order simply because it found a "better" resolution. *Id.*

## ANALYSIS

### Allocation of Parenting Time

We first address Father's argument regarding the allocation of parenting time. Father argues that the trial judge in effect ignored the agreement reached by the parties on residential parenting time after court-ordered mediation. He notes that both parties acknowledged at the outset of the trial that such an agreement had been reached, and that the trial court in fact found that both parties were fit parents. He contends that the trial court's disregard of the mediated agreement undermines the policy of requiring mediation, and asks this Court to modify the parenting plan to permit him the 165 residential parenting days per year provided for in the agreement reached by the parties prior to trial.

Here, the record below is complicated a bit by a discrepancy in the April 7, 2009 divorce decree, which apparently stemmed from either misunderstanding or miscommunications in the pleadings and proposals from the parties' attorneys to the trial judge. At any rate, the April 7, 2009 order stated that it "approved" the mediated agreement and granted Father 165 residential parenting days per year; however, the schedule set forth in the plan in fact resulted in 148 residential parenting days for Father. When the discrepancy was brought to the trial court's attention in the context of Father's motion to alter or amend, the trial judge explained

-8-

that his intent was to award Father the number of parenting days reflected in the detailed schedule. The order was then modified to reflect the trial court's original intent to award Father a total of 148 residential parenting days per year.[7] Therefore, we consider whether the trial court erred in awarding Father fewer residential parenting days than was set forth in the parties' mediated agreement.

In making parenting decisions, the paramount concern of the trial court must be the welfare and the best interest of the children, as set forth in Tennessee Code Annotated Section 36-6-401(a):

> In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. . . .The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.

Tenn. Code Ann. § 36-6-401(a) (2005). The trial court should, of course, consider any agreement by the parties as to parenting issues, including the residential parenting schedule. The trial court is not, however, bound by such an agreement, but instead must evaluate whether the agreed arrangement is in the best interest of the children. *See Tuetken v. Tuetken*, ___ S.W.3d ___, 2010 WL 3668176, at *7 (Tenn. Sept. 22, 2010); *Coats v. Coats*, No. M2007-01219-COA-R3-CV, 2008 Tenn. App. LEXIS 604, at *28, 2008 WL 4560238, at *11 (Tenn. Ct. App. Oct. 8, 2008) (citing *Smith v. Smith*, 220 S.W.2d 627, 630 (Tenn. 1949)). While an agreement on parenting issues would ideally reflect the parties' considered judgment on the arrangement that would best fit the needs of their children, it is also recognized that other factors can come into play in such an agreement, such as the original dysfunction in the parties' relationship, inequality of resources, reluctance to involve the children in the litigation, or even the parties' desire to get the divorce "over with." For that reason, the trial court has broad discretion to determine an appropriate parenting plan in light of the evidence adduced at a hearing and the best interest of the children, even where the parties have reached an agreement on such issues. *See Coats*, 2008 Tenn. App. LEXIS 604, at *28, 2008 WL 4560238, at *11. *See also* T.C.A. §§ 36-6-401(a) (2005) and § 36-6-404 (2005) (setting forth factors to be considered by the court in establishing parenting plans).

In the case at bar, Father can hardly claim surprise that the trial court considered an allocation of residential parenting days different from that reflected in the parties' mediated agreement.

_____

[7]Because the April 7, 2009 order was not a final, appealable order, the matter was still within the bosom of the trial court, and the trial court was free to change or modify the order. *Darty v. Darty*, 232 S.W.2d 59, 62 (Tenn. Ct. App. 1949).

Early in the trial, the trial judge stated explicitly that he wanted to hear both parties' testimony on what they felt was in the children's best interest, and would then make an independent decision on the parenting arrangement. In fact, both parties testified at some length about why they felt their proposals were best for the children, pointing out the relative strengths and weaknesses of the other parent's proposal. *See Coats*, 2008 WL 4560238, at *8 (no trial by ambush where trial court permitted one parent to testify on how he disagreed with the parties' prior agreement on parenting time). Thus, under the circumstances of this case, the trial judge was not bound by the mediated agreement of the parties on the allocation of residential parenting days.

Regardless of the parties' mediated agreement, Father argues that the trial court erred in awarding him only 148 residential parenting days. Here, the trial court explained its decision in part by a desire to fashion a schedule that would permit the children to feel that they have a "home." This consideration was clearly appropriate and, from our review of the record, supported by the evidence at trial.

The trial court also observed that Father "needs to take a portion of the time he wishes to spend with the children and concentrate on his income production and the filing of delinquent tax returns." The record fully supports this observation as well. In making decisions on parenting issues, even where both parties are deemed to be "fit" parents, the trial court must engage in a "comparative fitness" analysis comparing the parties' strengths and weaknesses to arrive at a parenting arrangement that best serves the children's needs. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630-31 (Tenn. Ct. App. 1996). That is precisely what the trial court did in this case. In some cases, the parties' handling of financial matters can fairly be separated from an assessment of their parenting abilities; not so in this case. During the time period from 2000-2004, the undisputed testimony shows that the parties had agreed that Mother would work part-time at most and focus on the parties' three small children, leaving Father as the family's financial provider. Despite agreeing to this responsibility, Father failed to file income tax returns for not one year, not two years, but *four years*. This resulted in a tax debt for both parties[8] that could only be "guesstimated" at $100,000 because, as of the trial date four years later, the situation had not yet been rectified. Father's only explanation of his failure to file the tax returns was that he "got extremely busy."[9] In making its comparative fitness analysis, the trial court could appropriately consider this as reflecting on Father's

[8]Although the trial court allocated 70% of the income tax debt to Father and 30% to Mother, there is nothing in the record indicating that the federal Internal Revenue Service is precluded from pursuing Mother's income and assets to satisfy a greater percentage.

[9]Father appeared to lay blame on a now-departed employee under his supervision, and also implied that Mother bore some responsibility. Father declined to testify that the responsibility for filing the tax returns was his. The trial court found that this was Father's responsibility, and the record fully supports this finding.

ability to shoulder the responsibilities associated with parenting the parties' three school-age children. Under all of the circumstances of this case, we find no abuse of discretion in the trial court's allocation of residential parenting time.

## Healthcare Decision-Making

Father also argues that the trial court abused its discretion in modifying its original divorce decree and permanent parenting plan to provide Mother the authority to make medical decisions for the minor children and notify Father of these decisions within twenty-four hours.

Under the parties' mediated agreement, the parties agreed that they would share decision making jointly with respect to the children, including the children's non-emergency medical care. Mother testified at trial that this was in the children's best interest, and it was adopted in the trial court's April 7, 2009 order and permanent parenting plan.

Thereafter, a dispute apparently arose between the parties with respect to medical decisions on the children. In Father's motion to enforce the parenting plan, he stated that Mother refused to discuss the ongoing medical needs of the children with him. The trial court apparently conducted an evidentiary hearing on Father's motion, but the appellate record does not include a transcript of the hearing. After the hearing, the trial court found that Mother did not violate the permanent parenting plan and modified the plan to provide that Mother should make all of the medical decisions for the children and notify Father within twenty-four hours. The trial court stated that this decision was based on a statement of counsel for the plaintiff Mother, the testimony of both Mother and Father in open court, and a review of the record as a whole.

A party who raises an issue on appeal to this Court is obliged to provide the Court with a record that enables the Court to review the issue raised. *See* Tenn. R. App. P. 24(b) (2006); ***State v. Bunch***, 646 S.W.2d 158, 160 (Tenn. 1983). Clearly, the trial court conducted an evidentiary hearing on Father's motion, at which he raises issues regarding the parties' decision making on the children's medical issues. However, Father has provided this Court with neither a transcript of the hearing nor a statement of the evidence at the hearing. *See* Tenn. R. App. P. 24(b) & (c) (2006). In the absence of a transcript or a statement of the evidence, this Court must presume on appeal that the evidence submitted to the trial court supports the trial court's findings. ***State v. Oody***, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Thus, in this case, we must presume that the testimony and other evidence submitted at the hearing on Father's motion to enforce the parenting plan supports the trial court's decision to grant Mother the authority to make medical decisions on the children's behalf

with subsequent notification to Father. Therefore, the trial court's decision on this issue must be affirmed as well.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant, John Bradley Greer and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE